[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION AND JUDGMENT ENTRY
* * * * *
This is an appeal from a summary judgment granted to appellee, Uptown-Downtown Bar, against appellant, Christopher Warner, by the Wood County Court of Common Pleas on June 11, 1997. Appellant brought suit against appellee for injuries he suffered when another patron of appellee's bar "sucker punched" appellant as he left the bar. Appellee sought summary judgment arguing that it owed appellant no duty because: (1) appellant was not on appellee's property when he was hit; and (2) it was not foreseeable that the other patron would harm appellant.
The trial court initially granted summary judgment to appellee on the basis that undisputed facts showed that appellant was not on appellee's property when he was injured, so appellee owed no duty to appellant. Appellant appealed that ruling. This court reversed the ruling of the trial court after finding that a genuine issue of fact does remain regarding whether appellant was on appellee's property when he was hit. Warner v. Uptown-DowntownBar (December 20, 1996), Wood App. No. WD-96-024, unreported. This court did not consider the second argument presented by appellee regarding the foreseeability of the events because the trial court had not addressed that issue in the judgment under consideration on appeal. Id.
The case was remanded to the trial court, and appellee renewed its motion for summary judgment on the basis that it owed no duty to appellant because his injuries were not foreseeable.
The trial court agreed with appellee that under the circumstances in this case, no reasonable mind could conclude that appellant's injuries were foreseeable. The trial court again granted appellee summary judgment.
Appellant has presented one assignment of error on appeal that reads:
"ASSIGNMENT OF ERROR
 THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF WHEN IT GRANTED DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE UNDER THE TOTALITY OF THE CIRCUMSTANCES THE DANGER REPRESENTED BY CURTIS CLINTON WAS FORESEEABLE TO THE DEFENDANT."
The standard of review this court applies when a summary judgment is appealed is found in Civ.R. 56(C) which shows when summary judgment can be granted. Civ.R. 56(C) provides, in pertinent part:
 "Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"
Keeping this standard in mind, we now consider the law in Ohio and the evidence presented by the parties in this case relating to the issue of the duty of a premises owner to protect business invitees from foreseeable harm.
The Supreme Court of Ohio has ruled:
 "1. An occupier of premises for business purposes may be subject to liability for harm caused to a business invitee by the conduct of third persons that endangers the safety of such invitee, just as such an occupier may be subject to liability for harm caused to such invitee by any dangerous condition of those premises.
 "2. An occupier of premises for business purposes is not an insurer of the safety of his business invitees while they are on those premises.
 "3. Where an occupier of premises for business purposes does not, and could not in the exercise of ordinary care, know of a danger which causes injury to his business invitee, he is not liable therefor."
 Howard v. Rogers (1969), 19 Ohio St.2d 42, paragraphs one, two, and three of the syllabus.
The Eighth District Court of Appeals considered the law announced by the Supreme Court of Ohio in Howard v. Rogers and concluded that Ohio courts are required to look at the totality of the circumstances to see if an occupier of premises knew or had reason to know that third persons might cause harm to business invitees.Reitz v. May Co. Dept. Stores (1990), 66 Ohio App.3d 188, 192-193.
In reaching its conclusion, the Eighth District Court of Appeals quoted comment f to Section 344 of the Restatement of the Law 2d, Torts (1965), which provides:
 "`Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.'" Id. at 193 quoting Comment f to Section 344 of the Restatement of the Law 2d, Torts.
The Eighth District Court of Appeals also stated:
 "In addition to the totality of the circumstances presented, a court must be mindful of two other factors when evaluating whether a duty is owed in cases such as this one. The first is that a business is not an absolute insurer of the safety of its customers. The second is that criminal behavior of third persons is not predictable to any particular degree of certainty. It would be unreasonable, therefore, to hold a party liable for acts that are for the most part unforeseeable. Thus, the totality of the circumstances must be somewhat overwhelming before a business will be held to be on notice of and therefore under the duty to protect against the criminal acts of others." Id. at 193-194.
Keeping these standards in mind, we now review the evidence that was presented by the parties in this case to show whether appellee knew or had reason to know that a danger existed that third persons would harm appellee's business invitees.
Appellant testified that soon after he arrived at appellee's place of business, he was confronted by a black male who "came up to me and wanted to fight." He later learned the black man's first name is Curtis. He said he was just standing on the side of the dance floor when the confrontation happened. He told Curtis he did not know him and did not want to fight him. He testified: "And he started to come towards me and his friend jumped in between and held him back, you know, he was between me and Curtis." He said the friend told him to "go away", so he did. He "walked back towards the pool area which is in the back of the other side of the bar, you know, hopefully just probably cool out, cool over, blow over." To his knowledge, no one from the bar was aware of the confrontation between himself and Curtis. Appellant said he had no further trouble that evening until he was sucker punched as he left the bar.
At the time of his deposition, he did not recall any conversation with his friends before he left the bar about a separate dispute they had with Curtis and his friends. He testified that his friends told him about the separate dispute they had with Curtis after he was injured and in the hospital.
Two of appellant's friends gave their depositions in this case and testified about their separate dispute with Curtis and his friends. Brian Dascani testified that he and two other friends, who were brothers, spent most of their time on the dance floor at the bar. About a half hour before the bar's closing time, they decided to take a break and to go to the restroom. While they were standing in line in the restroom, the door to the restroom was held open by individuals standing in line waiting for entrance. A black man who was already in the restroom got angry because the door was being held open. He got into a verbal dispute with Brian and his friends. Three friends joined the first black man and "tension was really rising * * *." Brian testified a bouncer from the bar came up and broke up the verbal exchange. He testified that the bouncer did a good job resolving the conflict and that the two groups involved in the dispute separated and went to different areas of the bar.
He stated that he was somewhat separated from the rest of the members of his group as they went down some stairs to leave the bar at closing time. He said: "As soon as I walked outside somebody pointed, `There he is,' and that was me, and I just put my hands up in the air and said, `We don't want any trouble, we just want to leave.'" He testified that appellant was standing in the doorway and that a black man sucker punched appellant just as Brian said they did not want to fight. Brian testified he saw appellant laying on the sidewalk, hurt, but being attended to by others. Brian ran trying to escape danger, but was pursued by six black males who beat him. He ran to another bar and called 911.
He testified that when appellant was hit, bouncers employed by appellee were at the door. When the fight began, they shut the doors. He said people outside were screaming for help, and the bouncers did not help.
Brian testified that he did not know a back door existed in the bar. He said no one ever made an offer to him or to his friends to leave by a back door. He anticipated a potential problem outside the bar and said he definitely would have accepted an offer to leave by an entrance that would have permitted him to avoid Curtis and his friends.
A second friend who gave a deposition was David Smith. He was one of the brothers who spent most of the evening on the dance floor of the bar with Brian. David also testified that his brother, Brian, and he had been involved in a dispute with Curtis and his friends about the restroom door being open. He testified that he did not see anybody from the bar during the dispute. He said they were able to resolve the dispute themselves and the two groups went to separate areas of the bar. He admitted he had made a statement in an affidavit that the bar manager broke up the dispute, but he said at the time of his deposition he did not remember any bar employee being involved in resolving the fight.
David testified that just before closing time, he and his brother were standing at the end of the bar waiting to meet the rest of their friends so they could leave together. He said Brian came up to them and said he thought there was going to be trouble with the black males they had the dispute with earlier in the evening. He testified that Brian told him he learned appellant had also had a separate dispute with Curtis earlier in the evening. He said Brian suggested they leave the bar. David was asked: "Okay. Now, when you went down the stairs leaving the bar that night, you guys were aware that there could be a potential altercation, is that correct?" He answered: "Yes." When he was asked why he went out the front door, he said: "I didn't know there was any other way to go out."
The manager who was on duty at the bar the night appellant was injured gave deposition testimony. He testified that he personally broke up the dispute between a group of black males and a group of white males about fifteen minutes before closing time. He said he noticed them from a distance because they were having a "heated" discussion. He said the two groups went their separate ways after he spoke to them.
He testified that he overheard the white males saying "they were concerned about their safety if they left the bar, or as they left the bar." He said: "And that's when I offered, if you're concerned about that I can let you out the back door." He said he does not believe appellant was present when he made the offer. He said the white males he spoke with refused his offer to go out the back door. The manager went back to his duties and heard someone call up the stairs to get an ambulance. He went to his office and called for help. When he looked out his window he saw appellant laying on the sidewalk in front of the bar.
The manager testified that he has called the Bowling Green Police officers to the bar for a variety of reasons including fake IDs or a fight across the street from the bar. He stated that he thought it was realistic to say there were probably thirty to forty assaults at the bar over a four-year period prior to the fight that caused appellant's injuries. He also stated that he expected that the number of calls he placed to the Bowling Green Police Department over the same four-year period "would be over a hundred times * * *". He reiterated that he called the police for many reasons, including fake IDs and parking problems as well as fights that were occurring off the bar's premises.
A second individual who was employed as a manager at the bar also gave deposition testimony. He testified that he was employed at the bar when appellant was hurt, but he was not working that evening, so he did not witness any of the events. He testified that he has occasionally forced individuals to use the back door to leave the bar. When he was asked to explain why he said:
 "If there was an altercation in the bar and I was relatively sure that there was someone waiting outside or thought that there might be more of a conflict outside if they went out the same exit as the other person.
 "Let's say we were throwing out both parties for fighting, you know, during the night, and, you know, we just threw one out the
 front, we might make the other one go out the back whether they want to or not because we figure it's just gonna go on out front and be the same problem."
He was asked what he would do if he suspected some black individuals were waiting outside the bar to have a fight with some white individuals and the white individuals refused his offer to them to leave by the back door of the bar. He said: "Then I'd call — well if I'd already made them the offer to go out the back door and they refused it, I'd probably go call the police." He explained he would try to get the police to disburse the groups outside. He said he had discussed that type of situation with the manager who was on duty when appellant was injured, and that he would expect the other manager would also call the police under those circumstances.
Curtis Clinton made a sworn affidavit. He stated in his affidavit that the bar manager on duty had intervened in the dispute between Curtis and his friends and appellant's friends about the open restroom door. He said he believed the dispute was resolved. He admitted punching appellant, but said he was acting in self-defense, because appellant and his friends "stepped toward me in what I perceived as a threatening manner."
Larry Smith, brother of David Smith, gave an affidavit in which he stated that he "witnessed a verbal exchange in the establishment's restroom area. The exchange started when a black male (who was approximately 5'8" or 5'9" and 170 pounds) got upset because other persons would not shut the door to the restroom. The verbal exchange resolved rather quickly and did not escalate into anything physical." He also stated: "During the remainder of the evening, I just hung-out and had a good time; I did not witness any further verbal exchanges or any physical altercations before leaving the establishment at about 2:00 a.m." He said he and his brother were outside the bar on the sidewalk when he saw several black men surround appellant. He heard a "loud `pop'" and saw appellant fall to the ground before the black men ran away.
We find that the testimony in the record creates a genuine issue of material fact that remains in dispute. Reasonable minds, construing the evidence in a light most favorable to appellant, could conclude that under the totality of the circumstances the manager of the bar knew or had reason to know that a danger existed of a fight between the group of black males and the group of white males who were arguing in the bar, and that the fight could cause injury to a patron of the bar. As the standards for foreseeability of criminal activity we have quoted show, the manager did not have to be able to foresee that appellant would be the actual patron who would be hurt, or that Clinton would be the individual who would actually assault appellant. Rather, the manager only had to know or have reason to know of a danger that caused injury to a patron. Accordingly, appellant's sole assignment of error is well-taken.
The judgment of the Wood County Court of Common Pleas is reversed, and this case is remanded for further proceedings consistent with this opinion. Appellee is ordered to pay the court costs of this appeal.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ Peter M. Handwork, P.J.
JUDGE
 _______________________________ George M. Glasser, J.
JUDGE
 _______________________________ James R. Sherck, J.
JUDGE
CONCUR.